# FOSHEE & TURNER COURT REPORTERS

1

IN THE CIRCUIT COURT OF
CHOCTAW COUNTY

CIVIL ACTION NUMBER 2000-10-C

ORA RUFFIN,
Plaintiff(s),
vs.
CONGRESS LIFE INSURANCE COMPANY,
et al.,
Defendant(s).

DEPOSITION TESTIMONY OF:
JOHN MACBAIN

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of JOHN MACBAIN, may be taken before Kelly B. Jackson, Registered Professional Reporter and Notary Public, State at Large, at the law offices of Bradley,

2

Arant, Rose & White, 1400 Park Place Tower, Birmingham, Alabama, on the 5th day of June, 2002, commencing at approximately 9:30 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the not witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of the Alabama Rules of Civil Procedure,

3

as amended, effective May 15, 1988, I, Kelly B. Jackson, am hereby delivering to Philip Carroll the original transcript of the oral testimony taken the 5th day of May, 2002, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

4

INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Carroll | 7 |
| Mr. Latta | 60 |
| Mr. Bolus | 69 |
| Mr. Cowan | 77 |
| Mr. Latta | 121 |
| Mr. Bolus | 126 |
| Mr. Cowan | 133 |
| Mr. Latta | 142 |

EXHIBITS

| | |
|---|---|
| Plaintiff's Exhibit 1 | 100 |
| Plaintiff's Exhibit 2 | 101 |
| Plaintiff's Exhibit 3 | 103 |
| Defendant's Exhibit 1 | 122 |


5

APPEARANCES

FOR THE PLAINTIFF(S):
DAVID COWAN, ESQ.
Mann & Cowan
2000-A Southbridge Parkway
Birmingham, Alabama 35209

FOR THE DEFENDANT(S):
FORREST S. LATTA, ESQ.
Pierce, Ledyard, Latta, Wasden & Bowron
Suite 400, 41 North Beltline
Mobile, Alabama 36608

PHILIP J. CARROLL, III, ESQ.
Bradley, Arant, Rose & White
1400 Park Place Tower
Birmingham, Alabama 35203

W. BRAD ENGLISH, ESQ.
Richardson-Callahan
3301 Washington Street
Suite 450
Huntsville, Alabama 35801

6

FOR THE DEFENDANT:(Cont'd)
PAUL BOLUS, ESQ.
Burr & Forman
3100 SouthTrust Tower
Birmingham, Alabama 35203

RICHARD E. TREWHELLA, ESQ.
Lloyd, Gray & Whitehead
2501 20th Place South
Birmingham, Alabama 35209

EXHIBIT
tabbies
G

# FOSHEE & TURNER COURT REPORTERS

79

tell me in our telephone conversation
that tiering was a move away from the
concept of insurance?
A. It moves more away from the
assigning of the risk to the premium --
insurance is pooling of risks. And the
more you drill down, is the phrase I use,
the move you get to charging an
individual the exact premium for that
person's experience, which then would not
be insurance.
Q. Then, in generalities, you
would agree that tiering is a move away
from the concept of insurance?
A. Relative to like age and sex
rating, I would agree that that's the
case, yes.
Q. And I believe you also told
me that you would not come up here to
Birmingham and condone the use of tiering
in the setting of premiums in health
insurance policies, true?
A. At the present time, that is

80

true.
Q. Do you agree with me that a
practice that is common in the industry
and generally accepted in the industry
can be abused?
A. Oh, yes.
Q. And you have seen insurance
companies take a concept that on its face
may seem fair, may seem totally logical
and abuse it, haven't you?
A. I am trying to think of a
particular situation.
Q. I guess --
A. It is possible to do that. I
can't think of a particular situation at
this point.
Q. I guess what I am getting at
is you told me that insurance companies
were very clever and, they are, aren't
they?
A. They are very intelligent,
yes, they have some very expert people.
Q. And so an insurance company

81

can take a common practice and abuse the
purpose of that practice, can't they?
A. Should they so desire, they
could do that.
Q. And the only thing that keeps
an insurance company from doing that is
the ethics and morals of the people
running the company, true?
MR. LATTA: Object to the
form.
MR. CARROLL: Same objection.
MR. BOLUS: Same objection.
A. That is one of the things,
plus regulation would be another area.
Q. For example, the department
might approve a specific type of rating,
but then after your approval, that rating
could be abused by the company, couldn't
it?
A. I guess hypothetically it
could be.
Q. Same thing with a policy
form, the department could approve a

82

policy form and then later the insurance
could take the form and abuse it,
couldn't they?
A. That would be possible.
Q. The same would be true for a
policy filed in Mississippi with
certificates sold in Alabama, it could be
approved in Mississippi, therefore,
quote, approved in Alabama and then be
abused, couldn't it?
A. That would be a possibility,
yes.
Q. And just so I am clear, the
Alabama Department of Insurance did not
approve this particular master policy,
that was done in Mississippi?
A. Yes, sir.
Q. The Alabama Department of
Insurance did not approve of the way the
rates were set on this policy, did they?
A. You said did not approve of
the way?
Q. Yes, sir.

83

A. The best I can say is we did
not disapprove the way. We were -- and
probably not actually aware of it.
Q. That is a better question.
It was not submitted to the Department of
Insurance in Alabama for approval, was
it?
A. Not to my recollection, no.
Q. You mentioned and there has
been some general discussion that the
purpose of tiering is to keep healthy
risks in the pool, that is the general
concept?
A. That is one of the results --
that is one of the results of tiering,
yes. Whether it is a purpose, you would
have to ask the insurance company, but
that's what it does.
Q. Well, if that's what it does,
I can only presume that that is what you
would think most insurance companies'
intent would be if they are going to use
that system?

84

A. I can't comment on their
intent, but that certainly is one of the
results of tier rating.
Q. If you assume for me that an
insurance company implements a tier
rating system with the specific goal and
intent to drive off sick people, to run
sick people out of the coverage, would
you condone that practice?
A. I would not condone that
practice if there was proof that it was
being done and that's -- the phraseology
I am not sure I would agree with. To run
people off.
Q. I want you to assume for the
purpose of my question in this
hypothetical that we are talking about an
insurance company through tier rating
targets people who are sick or who have
been injured or people who they think may
have high claims experience in the
future, with the specific goal and intent
to drive them away from the policy, to

# FOSHEE & TURNER COURT REPORTERS



run them off, that would not be a practice you would approve of, would it?
A. I would have to say, no, with those circumstances.
Q. That wouldn't be fair to those people, would it?
A. It would cause --
Q. My question is that wouldn't be fair to those people, would it?
A. Are you asking my personal opinion?
Q. I am asking you here today.
A. Fairness -- fairness is a legal term. It might be -- the consequence of tier rating is that it charges a risk a premium more commensurate with the risk. Tier rating whether it is acceptable or not is not up to me. It is a legal condition or if there are laws that prohibit it, that sort of thing. Tier rating has that effect. It charges individuals a premium closer to their actual experience. That



has the effect of charging higher premiums to higher risk individuals. Whether that is acceptable to me and I agree with it or not is not in my opinion relevant. It is whether it is legally acceptable and -- you know, as an individual if I thought it was being done for adverse reasons, I might not like it as an individual. But that does not deal with whether it is an acceptable or legal practice.
Q. I object and move to exclude as non-responsive. I need you to listen to my question. If you can't answer it, tell me you can't answer it.
Are you here today to tell the jury in Choctaw County that if an insurance company implemented a tier rating system with the specific design and intent to run, drive off sick people, to make them leave the coverage, you are not here today to say that is an acceptable practice, are you?



A. I am not -- if that was proven, that maybe would break other laws in the state of Alabama.
Q. From John MacBain, the actuarial expert, your standpoint, your point of view, that would be totally inappropriate if that was the specific design and goal of the company; correct?
A. From a personal perspective, I would not find that acceptable.
Q. If an insurance company came to you today, health insurance company on a group contract and said, Mr. MacBain, we are going to implement tiering and we are going to target people who are sick or hurt or who we expect to have high claims utilization and we are going to do it to get rid of these people, we are going to drive them out of the policy, that is what we want to do to help our profits, you would tell them don't do it, wouldn't you?
A. Yes, sir, as -- I would



today.
Q. And you would have surely as soon as you learned of what this insurance tiering was, you wouldn't have waited until today, would you? Let's go back to 1995, if an insurance company came to you then and said, look, Mr. MacBain, we want to hire you as our actuarial expert, we need to get rid of some of these sick people and we are going to use tier rating to do it, we are going to target them for increases to see if we can run them off, you would have told them not to do it, wouldn't you?
A. I would have told them to find another consulting actuary.
Q. And the reason for that is very simply, at least from your standpoint, that would not be fair to those people, would it?
A. From a personal perspective?
Q. Yes, sir.
A. I would not condone tier



rating.
Q. Do you believe an insurance company back in 1993, '94 and '95 without the Department of Insurance telling them anything should have known that it would be an abuse of a tier rating practice to target sick and injured people for the specific purpose of driving them out of their policy?
MR. BOLUS: Object to the form.
MR. LATTA: Object to the form.
MR. CARROLL: Object to the form.
A. I can't comment on what they would have known or would have not known.
Q. I said you should have.
MR. LATTA: Same objection.
Q. In 1994 and 1995 do you think insurance companies should have known that it is an abusive practice to target sick and injured people for the specific



purpose of running them out of the policy? They should have known that, shouldn't they?
MR. LATTA: Object to the form.
MR. BOLUS: Same objection.
MR. CARROLL: Same objection.
A. I can't comment on what they should or should not have known. I don't know the degree of their expertise or who they had. I can't comment on that.
Q. Let's assume that they had qualified, honorable, moral actuaries like you, they should have known it, shouldn't they?
MR. LATTA: Object to the form.
MR. BOLUS: Same objection.
MR. CARROLL: Same objection.
A. It is hypothetical.
Q. It is hypothetical. But I need you to answer it. If they -- if in '94 and '95 insurance companies had moral