IN THE CIRCUIT COURT OF MONTGOMERY COUNTY

STATE OF ALABAMA

| | | |
|---|---|---|
| SHIRLEY K. WADSWORTH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CV 02-2850-H |
| | ) | |
| UNITED WISCONSIN LIFE INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION OF: BARBARA WATSON

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of BARBARA WATSON may be taken on February 12, 2003, before Anne E. Miller, Commissioner and Notary Public, at Lowe, Grammas, Hitson & Dana, 3500 Blue Lake Drive, Suite 209, Birmingham, Alabama.



IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds as the time of trial or at the time said deposition is offered in evidence or prior thereto.



APPEARANCES

Appearing For The Plaintiff:

LOWE, GRAMMAS, HITSON & DANA
Mr. E. Clayton Lowe , Jr.
Mr. Brent Hitson
3500 Blue Lake Drive
Suite 209
Birmingham, Alabama 35243

Appearing For The Defendant:

BURR & FORMAN
Mr. Harlan F. Winn, III
3100 SouthTrust Tower
Birmingham, Alabama 35203

JANECKY, NEWELL
Ms. Nancy Howell Lard
1475 Financial Center
Birmingham, Alabama 35203

Court Reporter: Anne E. Miller

RECEIVED
JUN 0 6 2005



INDEX

Examination by Mr. Lowe .............. 5

Plaintiff's Exhibit 1 ................ 34
Plaintiff's Exhibit 2 ................ 56
Plaintiff's Exhibit 3 ................ 82
Plaintiff's Exhibit 4 ................ 98
Plaintiff's Exhibit 5 ................ 104
Plaintiff's Exhibit 6 ................ 104
Plaintiff's Exhibit 7 ................ 182
Plaintiff's Exhibit 8 ................ 186
Plaintiff's Exhibit 9 ................ 193
Plaintiff's Exhibit 10 ............... 202
Plaintiff's Exhibit 11 ............... 204
Plaintiff's Exhibit 12 ............... 209
Plaintiff's Exhibit 13 ............... 214
Plaintiff's Exhibit 14 ............... 226
Plaintiff's Exhibit 15 ............... 230
Plaintiff's Exhibit 16 ............... 236
Plaintiff's Exhibit 17 ............... 237
Plaintiff's Exhibit 18 ............... 254
Plaintiff's Exhibit 19 ............... 265
Plaintiff's Exhibit 20 ............... 275

tabbies
EXHIBIT
C

application, yes, I have seen one.
Q. How did you come to see an application? Was it in preparation for this deposition or is it something that you handled in administering this trust?
A. It was in preparation for the deposition.
Q. So you hadn't seen one before?
A. No. I would have no reason to.
MR. WINN: Just answer his question.
Q. Was this a document that the bank has in its possession or similar document? Maybe not signed by Shirley Wadsworth but this form?
A. No.
Q. So how did you come to see it then?
MR. WINN: She said she saw it in connection with her deposition preparation, and that's all I'm going to allow her to testify about.
Q. (BY MR. LOWE) Let's look at the first paragraph of Exhibit 2. It says, "The undersigned applicant hereby agrees to



participate in the American Medical Security or Prescription for Good Health Trust. Insurance is provided through policies procured by the trustee of American Medical Security or Prescription for Good Health Trust." Did I read that correctly?
A. Uh-huh (yes).
Q. Who is the trustee of the American Medical Security Trust?
A. The trustee for the Prescription for Good Health Trust is AmSouth.
Q. Who is the trustee for American Medical Security Trust?
A. I believe AmSouth is.
Q. Now this document, are you aware that this document is given to perspective participants to sign up to become participants in the group insurance trust?
A. No.
Q. You don't understand that?
A. Would you say that again?
Q. Do you understand that this document, Exhibit 2, that's entitled "terms and



conditions of the trust," is given to perspective participants such as Shirley Wadsworth in order to allow them to apply to become participants in the group insurance trust?
A. Yes.
MR. WINN: I want to object to the question. To the extent that you are asking her about a piece of a document, it's not a complete document there. You can answer the question, but I think it's unfair.
MR. LOWE: Well, we disagree about whether it's a complete document.
MR. WINN: That's fine. I'm just making my objection.
Q. (BY MR. LOWE) And your answer, I think I heard you say yes?
A. Yes.
MR. WINN: You are right. That's what she said.
Q. The last sentence I read, focus on that. It references that the policies are procured by the trustee. Did AmSouth



procure the policies of insurance that relate to the Prescription for Good Health Trust?
MR. WINN: Object to the form of the question. I think it's confusing, but if you understand it, you can answer.
A. AmSouth procures or gets the master policies for the Prescription for Good Health Trust, and it's my understanding that certificates are then issued by someone other than AmSouth to the actual insureds.
Q. What does AmSouth do to procure this insurance for the trust referenced in Exhibit 2?
A. There is an application. AmSouth as trustee is the applicant and they apply for the policy, the master policy, to United Wisconsin.
Q. Does AmSouth make any effort to determine whether one policy provided by United Wisconsin may be a better policy than another?
A. No.

base the statements made in this affidavit upon?
A. The only records I reviewed specifically before signing this one is the Prescription for Good Health. Now I have seen in my year --
MR. WINN: Just answer the question that he asked.
Q. And your answer was? He cut you off. What was your answer?
A. The only one I read directly before signing this one was the Prescription for Good Health Trust.
Q. Now what part of this affidavit then is based upon your personal knowledge derived from your employment responsibilities and duties?
MR. WINN: If you need to read it -- are you asking for a particular portion of this affidavit?
MR. LOWE: Yes. Take your time and look at it again.
A. Well, I handled the group insurance



trust, the accounts themselves for a period of time. So I had personal knowledge in handling them.
Q. What did you do to handle them? I guess we haven't really touched on that enough.
A. You accept the policies. You hold the policies. You fee for your services. If an application comes in for a group policy, then you review it and --
Q. How about corresponding with Departments of Insurance or regulatory authorities or anything like that that have a question of AmSouth regarding the trust? Is that something you also handled?
A. I never personally handled any correspondence.
Q. Did you supervise that?
A. No.
Q. Did people under you handle that?
A. No.
Q. Are you saying that didn't happen?
A. No. I'm not saying that didn't



happen. My personal knowledge, I don't know of correspondence.
Q. So is it fair to say then in your handling of this trust that you never had any correspondence or prepared any forms that you knew were going to a Department of Insurance or the Department of Labor or anything like that?
A. Yes.
Q. You did do that?
A. No. It's fair to say I did not do that.
Q. Okay. And to your knowledge then, no one else at the bank did that?
MR. WINN: To your knowledge is what he is asking.
A. To my knowledge, I don't know.
Q. (BY MR. LOWE) Let's look at paragraph three of your affidavit, Exhibit 5. Do you see where it says "this trust owns group insurance contracts as is described in the trust agreement"? Do you see that?



A. Uh-huh (yes).
Q. We talked a little bit about group insurance earlier. Do you know the distinction between individual insurance and group insurance?
MR. WINN: Object to the extent it calls for a legal conclusion. Otherwise, you can answer what you know.
A. Well, I mean, I think I have a basic understanding of what is the difference between an individual policy and a group insurance policy.
Q. I assume you have insurance policies for yourself, don't you?
A. Right.
Q. And I would also assume -- and tell me if I'm wrong -- that the ones you probably have through your employer are group insurance, right?
A. Yes.
Q. And it's because you are a large group of employees; is that right?
A. Uh-huh (yes).

that right?
MR. WINN: Object to the form of the question.
A. The document states that we hold the policies.
Q. Among other things, true. I mean, that's what it says in one instance. But you have stated here that this insurance policy was issued for the benefit of the participants. Now how do you know that?
A. The insureds are the beneficiaries. It's for their benefit.
Q. Okay. Who is looking out for their benefit under this trust? Is it AmSouth, United Wisconsin, AMS or someone else?
A. AmSouth holds the policies.
MR. WINN: Listen to his question. If you know the answer, you can give him the answer. If you don't know the answer, then tell him you don't know the answer. Ask the question again or read it back.
(Record read.)
A. I don't know.



Q. (BY MR. LOWE) Can you think of anyone at AmSouth that might know the answer to that question?
A. No.
Q. Let's look at paragraph four of your affidavit, Exhibit 5. Do you need a second to read through it? It's a longer paragraph.
A. Okay.
Q. Let's look at the first sentence, which states pursuant to the trust agreement, AmSouth does not perform any administrative duties and has no "responsibility" nor [liability] for the collection, remittance, [or] forwarding or payment of premium." And you site the trust agreement paragraph three that you attached and which is Exhibit 6 to your deposition. Now do you determine that to be a true and correct interpretation of the trust agreement?
A. Yes.
Q. And did you read paragraph three of



the trust agreement before you prepared this statement in this affidavit?
MR. WINN: Object to the form of the question, to the extent it misconstrues prior testimony.
Q. Did you?
A. What's your question again?
Q. Did you read paragraph three of Exhibit 6, the trust agreement, before preparing and signing this statement here in paragraph four of Exhibit 5?
MR. WINN: Same objection.
A. I believe I stated before, I read the trust agreement before I signed the affidavit.
Q. Are there any other places in the trust agreement where you believe duties of the trustee were assigned or given to American Medical other than here in paragraph three?
MR. WINN: I'm going to object to the form of that question. I think that misconstrues the affidavit.



Q. (BY MR. LOWE) Let me rephrase that. Paragraph three of Exhibit 6 says that trustee shall not assume any responsibility for certain things. And then it goes on to say nor shall the trustee have any duty or responsibility for certain things. Now is there any other paragraph in the trust agreement, Exhibit 6, that you rely upon to assert that the trustee doesn't undertake certain obligations?
MR. WINN: Object to the form of the question. I think it's totally long and confusing.
Q. Do you have an answer? Just because Harlan is talking doesn't mean you don't have to answer.
A. I would need to read the entire agreement to see if there are other areas.
Q. Well, you read it before you came in here, and you read it before you signed this affidavit, didn't you?
A. Yes, I did.
Q. Okay.

whatever?
A. I'm not sure how the vault is. I don't go down to the vault. I'm not sure how they hold them. They would do it either by the plan, the group insurance trust, or by the security itself.
Q. How much or how many pieces of paper do you think this involves?
MR. WINN: What involves?
Q. Just all this whole Prescription for Good Health Trust.
A. This is a relatively small one of the group insurance trusts. It doesn't have any sub industries or -- it's got a master policy, some riders, some amendments.
Q. That's the Prescription for Good Health Trust. What about the American Medical Security Trust? It has sub accounts, doesn't it?
A. It has volumes.
Q. How many pages would that be? Or if you want to equate it to like the size of a banker's box? Do you know what that looks



like?
A. It's more than that.
Q. I'm saying how many boxes would that be?
A. I couldn't tell you.
Q. Well, more than ten?
A. I honestly -- no, I don't think so.
Q. Looking at Exhibit 6, the trust agreement, paragraph 20, it notes that the trust may be amended upon unanimous consent of the trustee and the insurers. Have you, the bank, ever made an effort upon its own to amend the trust?
A. No.
Q. Has the bank ever considered terminating the trust?
MR. WINN: Let me just object to the extent you are asking for any information that may have come from the legal department. To the extent you are asking her from a business standpoint, if she knows -- and I don't know if she does or not -- I would allow her to answer. But to



the extent you are requesting any information she may have got from the legal department, I'm going to object. Do you understand the question as I have modified by objection?
Q. (BY MR. LOWE) I think he is asking you a question now.
A. Would somebody tell me what the question is?
Q. Has the bank considered terminating this trust agreement; that is, getting out of it?
A. That would be a business decision for the whole line of business, I believe.
Q. I know, but you are here to testify on behalf of the bank. Have you ever heard any discussions regarding getting out of this trust agreement?
A. There is constant discussion about what lines of business we want to stay in and stay out of.
Q. Specifically paragraph seven gives you the right to resign.



A. Correct.
Q. Have there been any discussions within AmSouth Bank about resigning as trustee?
A. There have been discussions about exiting this line of business as a whole.
Q. For what reason?
A. It's not an area that we are focusing on going forward. We really don't want to have products that are flat based fees that are not profitable and don't make money for us. We are there to make money, manage money. That's where we make our money. So going forward would not be taking on any more of these.
Q. Well, you have had this one since 1994. I mean, has a decision been made to resign at some point?
A. Discussions are always ongoing about our different product lines that we offer.
MR. WINN: What he is asking you has a specific decision been made that you are aware of to resign from this type of